*606 ON REHEARING
LEIGH M. CLARK, Retired Circuit Judge.
The concluding paragraph of appellee’s brief on application for rehearing states:
“Based on the foregoing propositions of law, the State respectfully submits that this cause is due to be affirmed. The State would submit that the jury verdict was sustained by the evidence produced by the State at the trial of the defendant. Further, the trial court’s adjudication of guilt can be referred to the general verdict of the jury, and will suffice as a basis for the defendant’s conviction.”
Appellee apparently overlooks the fact, as stated in the opinion on original submission, that the judgment of the trial court was not based on any verdict of a jury, that the case was tried without a jury.
It is our view that legal principles governing the question of the validity of a judgment based on a general verdict as to a two-or-more-count indictment do not always control on appeal from an adjudication of guilt in a case in which a jury is not the trier of the facts.
Upon the return of a verdict and the discharge of a jury, it is exceedingly difficult, if not impossible, to so re-assemble all of the jurors as to determine satisfactorily whether the verdict finding defendant guilty was applicable to each count of the indictment, and, if not, to which count or counts it was applicable. In the instant case, it presently seems that there will be no difficulty in complying with the directions contained in the opinion wherein it was decided to remand the cause to the trial court for action by the same trial judge that tried the facts and entered the judgment. Upon a return to such remandment, we can then proceed to a determination of the issues without any concern as to whether there was a finding of guilt on both counts and, if not, whether defendant was found guilty on count one or, on the other hand, he was found guilty under count two. Such procedure, in our opinion, cannot conceivably result in any injustice to either party and compliance therewith will be of assistance in our effort to dispose properly of the appeal in this Court. The application for rehearing should be overruled.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All the Judges concur.
ON RETURN TO REMAND
LEIGH M. CLARK, Retired Circuit Judge.
In accordance with previous order remanding this case to the trial court for clarification of the question whether defendant was adjudged guilty under both counts of the indictment and, if not, whether he was adjudged guilty of possession of cocaine, as charged in the first count, or, on the other hand, whether he was adjudged guilty of possession of marijuana, as charged in the second count, the return of the trial court shows by its amendment to the judgment nunc pro tunc that defendant was not found guilty under both counts but that he was found guilty under Count One only, which charged possession of cocaine. It thereby becomes unnecessary for us to consider the issue raised by appellant pertaining exclusively to the second count, which charged defendant with the possession of marijuana.
The single issue as to the first count of the indictment is thus stated in appellant’s brief:
“Was the seizure of what later proved to be cocaine from the automobile of defendant valid?”
As hereafter explained, we conclude that it was.
A large part of the evidence consisted of the testimony of Sergeant Jim Brooks of the Narcotics Division of the Jefferson County Sheriff’s Department. He testified that on November 11, 1979, he received information from a Center Point confidential informant that narcotics activity involving defendant and another person was occurring at one of three houses located at *607 2729 Center Point Road in Jefferson County. The three houses were located close together; the occupants used the same address and a common driveway from the highway to the curtilage of each house. On November 11 and 12,1979, Sergeant Brooks and others closely watched the houses, but they saw no activity at that time. On November 13 he conducted surveillance again. He testified that just before he and the other officers stopped at or near the premises the following occurred:
“Just previous to sitting up in the area, there, as we came by the drive way, ourselves, in a vehicle, we observed a vehicle coming out of the drive way onto Center Point Road, and this vehicle turned North on Center Point Road.
“It was driven by Wayne Box, and it was occupied by a passenger named Danny Bice, and this was at approximately 3:30 P.M.”
The testimony of the witness continued as follows:
“A. No activity. When we first set up, and for a period of time until approximately 8:30 P.M., the same two people, Wayne Box and Danny Bice returned in the same vehicle that we had observed earlier, a ‘74 Blue Torino.
“When they pulled into the front of the house, there, they pulled right up adjacent to the front door, just a few feet from the front door.
“Danny Bice took a small, brown sack into the house, and helped Wayne Box place three large, green garbage bags, disposal, plastic type, filled with an unknown substance in the trunk of this ‘74 Blue Torino.
“And, then, they placed a smaller package into the front seat.
“Q. These packages that you describe, did they bring them from inside the house there and put them in the trunk?
“A. Un — hunh, yes, sir.
“Q. O.K. After they put these packages into the car, what, if anything did you do, or observe?
“A. Then the vehicle drove away, with Wayne Box driving.
“Q. Did you all continue your surveillance of the house?
“A. We did. Apparently Danny Bice stayed behind, and, as the vehicle drove away, Blanton, who was out on the road in a chase car, was notified, and, due to the heavy traffic, he lost the vehicle as he attempted to over take him.

“Q. I’m sorry, Wayne Box left. Mr. Box was not in the car with him, is that correct?
“A. Danny Bice stayed behind.
“Q. O.K. Now, after he had left and you all continued your surveillance, what was the next thing you saw, or observed, concerning the house located at 2729 Center Point Road?
“A. We were able to look into the window from our position there in the woods and we observed Danny Bice sitting in an area of the house, there, apparently in front of a table.
“And, for — he had a quantity of white looking substance in front of him, on a mirror like area. It was a bright, shinny like area, either what a glass, or a mirror, would look like.

“A. Right along in there is where we were able to observe, looking into the window of the house, itself.
“Q. O.K. So, this (indicating) is the window on the front of the house, is that correct?
“A. Yes, sir. It was a rather large type window, coming down within two and one-half feet, or so, from the ground.
“Q. Were there any curtains, or anything, on the window?
“A. There were a burlap type curtain, there, but at this time the curtain was not drawn on this particular window, nor on another window on the front, that went into the bedroom of the house.
“Q. O.K.
“A. As the night progressed, the curtains were pulled together, there.

*608 “Q. O.K. Do you have a judgment ás to how far from this point next to the ‘W’ it was to the window of the house, it was, in feet?
“A. In judgment—
“Q. Just your best judgment.
“A. Forty to forty five feet.
“Q. O.k.
“A. Fifty, at the most; forty to fifty, I think.
“Q. After you observed this, what, if anything, did you observe then?
“A. We heard a peculiar type sound coming from the house.
“Danny Bice was using the poker card and razor blade to cut the cocaine. He was chipping the cocaine, and, as the razor struck the glass, or the mirror like surface, it was making a whole lot of racket, and every dog from a mile and a half was barking, it seemed like.
“Q. Could you see the playing card?
“A. We could see the playing card.
“Q. What, if anything, happened next?”
Thereafter, Sergeant Brooks testified that “about 10:50 p. m., 10:45, or 10:50, p. m.,” the defendant returned and he and Danny Bice loaded some more sacks, “and all into the car,” and they locked up the house, locking the front door, and they left the scene. The witness stated that surveillance was maintained at the same “observation point” until daylight of the morning of November 14; he resumed it about noon, with the understanding that another officer was in the process of obtaining, or had obtained, a search warrant for the house. The witness further testified that he then maintained surveillance of the area at intervals, including a large part of the night of November 16-17, and the following occurred:
“Q. What, if anything, did you observe at approximately 6:35 a. m. that morning?
“A. It was at approximately 5:30 a. m.
“Q. O.k. At approximately 5:30, was it dark at that time?
“A. It was just beginning to break dawn.
“Q. What, if anything, did you observe at that time?
“A. The same vehicle, the ‘74 Blue Tori-no, arrived at the scene and pulled into the front yard.
“It was the same vehicle that we had observed earlier being driven by Wayne Box. Wayne Box got out of the car, in the little trail, that I mentioned there, near the end of the arrow—
“Q. Are you referring to right here (indicating)?
“A. Right there.
“Q. Indicated by the area where you have drawn the two lines?
“A. Un hunh.
“Q. O.k.
“A. Box got out of the car, there, and went up into the woods, there, into the wooded area. It is not really woods. It’s a vine covered type area, with kudzu type morning glory type vines.
“Q. O.k., sir.
“A. And, he went into the area, there, and he was looking around in the weeds, “At this point in time, Harris and myself were around the ‘O’ the first ‘O’ in ‘W’ there.
“Q. O.k. I’m going to put just a little ‘X’ by the ‘O’. Is that where you were at that time?
“A. At that time, when he drove up.
“Q. All right. Go ahead. What else did you observe?
“A. He walked up to right behind where the ‘X’ and the date of the 13th is marked there, right in that area right there.
“Q. O.k.
“A. And began to rummage around in the weeds, bending over like he was looking for something.
“I had to move around to get — I was still in the same area, but I had moved to get my line of sight good, there, and it was still breaking day more gradually each minute.
“He looked around, I guess, for about ten minutes, and then he went back to his car, and he got into the car, and he backed up like he was going to go back out the driveway.
*609 “But, when he backed up, the car, he stopped it in a position headed out the driveway, but still in front of the house, more or less.
“Q. What did you observe next?
“A. And it got more light over the next fifteen minutes, or so, Sgt. Phillips was waiting out on Center Point Road, in his vehicle, and we notified him, talking back and forth about the situation.
“We were waiting for Bice [sic] to make another move. He did. He got back out of the car, again, and at this time it was — the line of vision was very good. It was—
“Q. It was daylight at that time?
“A. It was very good daylight.
“Q. O.k. What did you observe Mr. Box do there, the second time that he got out of the car?
“A. As he got out of the car, he walked back up into the same area, there, and began rummaging through the vines and weeds again.
“He finally picked up some plastic bag, a little small plastic bag, like.
“Q. Could you see the bags?
“A. We could see the bags in his hand. They looked like they had something white in the bottom of them. They weren’t filled up. It was just a portion of white, maybe a third of the way up in the bag, something like that.
“He took—
“Q. O.k. go ahead. What did he do?
“A. He took the bags and he went back to his car, and he got into the car, and, from what we could observe there — from what I could observe there, he placed the white bags into a brown paper sack.
“Q. O.k.
“A. And, at this time, the girl, this white female girl was sitting there, he handed the — she would turn around. We really couldn’t see what he was doing with his hands when he got them below the seat line.
“But, then, he cranked up and drove down the driveway. We notified Phillips that the vehicle was coming out, and, as he headed onto Center Point Road, there, Phillips blocked him, and he backed up the driveway.
“We were, myself and Harris, on foot, and we started chasing him down the driveway, or following him, and as he attempted to back up the driveway, as Phillips approached him in his vehicle, we got him stopped in the driveway.
“Q. All right. After the car was stopped, what, if anything, did you do?
“A. I identified myself to Wayne. Wayne got out of the car, and the girl got out of the car on her side.
“I looked into the car, itself, after Wayne got out, and there was a purse laying on the front seat.
“The purse was open, and in the top of the purse there was a paper sack.
“Q. Did you remove the paper sack out of the purse?
“A. I believe Harris actually took the sack from the purse. He was on the side with the female and away from the steering wheel.
“I was on the side.
“Q. Did you observe the paper sack being removed by Officer Harris?
“A. Yes, sir.
“Q. Did you see what Officer Harris did with the paper bag that he removed from the purse, there?
“A. He kept it on him until Sgt. Phillips got up to the car, itself, and after we had secured that scene, so far as taking Wayne Box and the white female into custody, we removed ourselves from where we were and went back into the house.”
Other evidence showed without dispute that the plastic bags contained cocaine.
Appellant cites numerous authorities on the general subject of Search and Seizure, but fails, in our opinion, to show an unreasonable search and seizure as to the cocaine that was found in the automobile. We do not agree with the statement of appellant, “Based upon the foregoing authorities, it is submitted that the arresting officer had no reasonable ground to believe that Box was at the time of his arrest committing a crime *610 or was otherwise engaged in any activity which could have given rise to probable cause to effect an arrest or search.” On the contrary, we think that the officers at that time had much more information and knowledge than was required to give them probable cause for believing that Box was at the time, and had been for several days, engaged in violation of the Alabama Uniform Controlled Substances Act, and they were justified in making an arrest of him at the time. Nor are we in agreement with either of the apparent conclusions of appellant as found in each of the two following sentences in his brief:
“The plastic bags, which proved later to contain cocaine, were in a brown paper bag, and were not visible until the bag was opened. Further, the report shows that this paper bag was concealed in the purse of the girl passenger in the car.”
Although it may not be conclusive that the “plastic bags” were “visible” to the officers as they looked into the automobile, it is conclusive that they were visible to Sgt. Brooks at the time defendant picked them up and took them to the automobile where they were placed in the brown paper bag. As to the second sentence, instead of the paper bag being concealed in the purse, the testimony of Sergeant Brooks was as follows:
“Q. In fact, it will be your testimony that you saw that?
“A. That is what I thought I saw. I thought that it was on the purse, you know.
“Q. I understand. Are you saying that you are not sure now and that it could have been concealed in the purse?
“A. Well, the brown paper bag, a portion of it was in the purse. Part of it was on the purse.
“From my field of vision, from my line of sight, from where I first appeared to see.”
The paper sack that contained the plastic bags that contained a white substance that proved to be cocaine was partly in an open purse and in plain view of the officers at the time they arrested Mr. Box and took possession of the automobile. They knew that only a few moments before he had manual possession of the sack and its contents. In taking the defendant and the automobile into their custody, it was their right and duty to take possession of the sack and its contents. There was no violation of appellant’s right to security against unreasonable searches and seizures, and we find no support for such insistence in any of the authorities relied upon by appellant.
We find no error in the record prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M.' CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.